IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE

AT KNOXVILLE

MARCH 1999 SESSION

FILED

October 6, 1999

Cecil Crowson, Jr.
Appellate Court Clerk

| | | |
|---|---|---|
| STATE OF TENNESSEE, | ) | C.C.A. 03C01-9711-CR-00504 |
| | ) | JOHNSON COUNTY CRIMINAL |
| | ) | |
| Appellee, | ) | Hon. Arden L. Hill, Judge |
| | ) | |
| | ) | |
| | ) | |
| vs. | ) | (SETTING FIRE TO |
| | ) | PERSONAL PROPERTY, |
| | ) | ASSAULT) |
| WILLIAM W. CARPENTER, | ) | |
| | ) | NO. 2788 |
| | ) | |
| Appellant. | ) | |

FOR THE APPELLANT:

GERALD L. GULLEY, JR., ESQUIRE
P.O. Box 1708
Knoxville, TN 37901

ROBERT Y. OAKS
Assistant Public Defender
Main Courthouse
Elizabethton, TN 37643

FOR THE APPELLEE:

PAUL G. SUMMERS
Attorney General & Reporter

TODD R. KELLEY
Assistant Attorney General
425 Fifth Avenue North
2nd Floor, Cordell Hull Bldg.
Nashville, TN 37243

JOE C. CRUMLEY, JR.
District Attorney General

KENT W. GARLAND
Assistant District Attorney
Main Street, Unicoi County
 Courthouse
Erwin, TN 37650

OPINION FILED:_____

AFFIRMED

CORNELIA A. CLARK
Special Judge

## OPINION

The appellant, William W. Carpenter, appeals as of right the sentencing determination of the Johnson County Criminal Court. The appellant was convicted of setting fire to personal property, a Class E felony, and assault, a Class A misdemeanor. The court imposed an eighteen month sentence for setting fire to property, to be served concurrently with an eleven month, twenty-nine day sentence for the assault. All but ninety days of each sentence was suspended. The sole issue raised by appellant on appeal is whether the trial court erred in failing to grant complete probation. For the reasons set forth below, we affirm the judgment of the trial court.

In September 1995 appellant was married to Shelly Carpenter. Mrs. Carpenter was then engaged in a romantic relationship with another man, James David Kennedy. Kennedy and the appellant had argued previously, and the appellant directed Mr. Kennedy not to continue seeing his wife. However, Mr. Kennedy did continue the relationship with Mrs. Carpenter.

Kennedy testified at trial that on September 8, 1995, he and Mrs. Carpenter spent the evening "frolicking around" in the woods before later returning to the Carpenter residence. While they were sitting on the back steps the appellant burst out of the house and struck Kennedy on the head with a piece of fire wood. According to Kennedy, he rolled off the steps into the dirt. The blow impaired his vision and hearing. As he tried to get to his feet, the appellant struck him several times. He began to bleed profusely. When Kennedy finally managed to stand up and lean on the fender of a nearby truck, the appellant came back out of the house with a shotgun, and made Mrs. Carpenter and Kennedy go inside. Appellant stated that he intended to kill all three of them.

Once inside the house, Kennedy testified that the appellant took a wooden dowel rod and swung at him. Kennedy managed to duck or avoid being hit each time. Kennedy finally was able to lift a chair to defend himself. He feared for his life throughout the ordeal. At one point appellant went outside and tried to blow up Kennedy's car. Mrs. Carpenter eventually managed to leave and call the sheriff's department. Kennedy also testified that appellant hit his wife several times, including once on the shoulder and once on the thigh.

After Mrs. Carpenter left, Kennedy testified that appellant "went ballistic" and again began beating him with a steel bar. Kennedy put his arms up to protect himself. Both arms were broken by the blows. Appellant then began "whaling on" his legs. Kennedy was afraid to run because appellant kept his shotgun nearby. Appellant then began trying to destroy Kennedy's knees. Appellant's anger grew and his blows got harder. At one point he used a hunting knife to cut Kennedy's clothes off, and inflicted numerous stab wounds in the process. Appellant put his shotgun to Kennedy's face and said he was going to blow Kennedy's brains out. Kennedy believed he was going to die, and began to pray. While he was on his knees appellant hit him over the back of the head, probably knocking him unconscious. The next thing he remembered was appellant holding his legs spread-eagled while hitting his groin area with a steel bar. Appellant told Kennedy he was going to castrate him and feed his private parts to the dogs. The intense pain again caused Kennedy to lose consciousness. When he awoke again appellant had left the house. Kennedy heard a boom and saw a large flash of light. He knew it was his van beginning to burn. At that time Kennedy was unable to move. A bone was protruding from one of his legs. Shortly thereafter help arrived.

The appellant, a Vietnam veteran, testified but described the encounter much differently. He confirmed that in June 1995, he had confronted Kennedy about the affair with his wife and instructed Kennedy not to see her again. On July 13 the Carpenters formally separated and Mrs. Carpenter and the children moved out of the residence. Appellant continued his job as a long haul truck driver.

On Friday, September 8, 1995, appellant testified that he returned from a road trip and found his driveway gate locked with a strange lock. Afraid that someone was stealing from him, he left his vehicle and walked up the long driveway. When he arrived at the house he recognized David Kennedy's van. He entered the house through the back door. He found his son's shotgun lying in the living room. It was loaded. He then testified that he knew "what was going on." He called to his wife and Kennedy upstairs, and Kennedy replied. After a short time Mrs. Carpenter and Kennedy came downstairs. Appellant testified that he assumed Kennedy thought he was about to receive a thrashing, but that appellant hoped things would work out. However, Kennedy pushed at appellant. Appellant at this point only intended to thrash or "whoop" Kennedy, and did not intend to kill him. After Kennedy pushed him, appellant testified the men began a fist fight , out the door and down the steps. He admitted he struck one blow that "addled" Kennedy. Appellant testified that he hoped to get in one more good lick and end the fight. However, Kennedy picked up a piece of firewood and hit appellant across the arm. According to appellant, "Then I knew in my heart that the fight was on."

Appellant admitted making animal growls in response to blows he received. He stated he did not intend to kill Kennedy, but only to put him on the ground and walk away. He testified that his arm was useless, but he continued to fight Kennedy and eventually put him on the ground. However, Kennedy got up and ran into the house with Mrs. Carpenter. Rather than

4

leaving, appellant followed him to tell both parties to leave. Appellant testified that it was Kennedy who picked up the dowel rod. Appellant grabbed Kennedy by the neck and pants and tried to throw him out the door. Kennedy attacked him with the rod and they continued to give each other parry blows. Appellant took the rod from Kennedy, who then apologized and asked to stop the fight. When Kennedy continued to express fear appellant even handed him the rod back. He denied ever threatening to kill Kennedy.

Appellant testified he then asked Kennedy and his wife to sit down, and began lecturing them on the evils of their actions. He admitted that his tone was very forceful, and he concluded by saying that if Kennedy did not leave him alone he would thrash him again. Appellant stated that his wife picked up the shotgun and told Kennedy it was unloaded. Mrs. Carpenter then ran to get help. Kennedy tried to grab the steel rod and came at appellant, who threw his arm up and was hit in the wrist. Kennedy fell on top of appellant and they began wrestling. Appellant testified that he never intended to kill Kennedy, but did decide to "render this man so helpless that all he could do was lay there . . ." and then go report this incident to law enforcement officers. Appellant admitted he attempted several blows to Kennedy's groin area, trying to render him helpless. He continued to strike Kennedy's ankles and legs because he was still struggling. Appellant never intended to hit a death blow. Finally, Kennedy started reciting the Lord's Prayer and appellant knew he had "done the job [he] needed to do . . ." He then gave Kennedy a cigarette. Appellant knew without a doubt Kennedy was fine. At trial appellant expressed remorse and testified that everything he did was in self-defense. He also denied ever drawing a knife.

Appellant stated he then left the house. As he passed by Kennedy's van he noticed some of his own tools inside. He also noticed photographs of his wife. This discovery infuriated him. Observing a five-gallon can of gas sitting in the van, appellant reasoned that since Kennedy had trespassed and taken his tools, it was reasonable to burn his van. He said:

> The old van ain't no good anyway, and I'll make sure he don't drive it away from here even though he may - - I left him one good leg. I didn't leave the man to where he couldn't fend for himself as far as whatever. I mean, I didn't kill this man to the point, or hurt him to the point of - - that he still wasn't capable of doing things for himself.
>
> . . .
>
> I felt at this point the van actually belonged to me.

Shelly Carpenter testified for the state as a rebuttal witness. She stated she had moved back into the marital home on September 7 because her husband was on the road and told her she could stay there. She did not expect him home on September 8. Mrs. Carpenter remembered a "terrible fight" between the men, involving a steel bar, a wooden stick of some kind, and a long gun that was unloaded. She saw appellant first hit Kennedy with either the bar or the wooden stick. Appellant hit Kennedy on his arms, legs and head. She went looking for the gun, which she had loaded earlier in the day for protection. She found it unloaded. She remembered her husband picking it up, but could not remember if he threatened anyone. She did admit to being very frightened.

Mrs. Carpenter testified that her husband took out several knives, started sharpening them, and commented that he ought to castrate Kennedy. She left to look for help, and did not observe anything else inside. She did see appellant flatten all the tires on Kennedy's van and get a gas can. She did not see what he did with the can. When she last saw Kennedy he was sitting up,

but had blood on his arms and head.

Mrs. Carpenter stated that she could not remember who struck the first blow. She also admitted on cross-examination that she lied during her testimony at the preliminary hearing in November 1995. At that hearing her testimony was very similar to that of Mr. Kennedy. In particular she testified at the preliminary hearing that the fight began outside on the porch and that appellant attacked Kennedy first. She remembered many more details of the process of the fight at the preliminary hearing than she did at trial.

Both Kennedy and his treating physician testified about his injuries. As a result of the incident Kennedy suffered a broken right wrist, two broken arms, and a fractured left leg and left ankle. He also had numerous lacerations on his head and back, bruises and swelling about the face, and a blunt trauma injury to his spleen which necessitated its removal. Kennedy retains metal plates in his arms. Appellant did not seek medical treatment after the fight.

Appellant was initially charged with the aggravated assault of Shelly Carpenter; the attempted first degree murder of James David Kennedy; and setting fire to Kennedy's personal property. After a jury trial, appellant was found not guilty of any offense against Mrs. Carpenter, guilty of assault, a Class A misdemeanor, as to Mr. Kennedy, and guilty of setting fire to Kennedy's personal property, a Class E felony. The trial court sentenced him to eleven months twenty-nine days for the assault and eighteen months for setting fire to personal property. The sentences were ordered to be served concurrently. Each sentence was suspended after the service of ninety days. On the felony offense the appellant was placed on supervised probation for five years.

In his brief appellant raises only a sentencing issue: whether he should have been granted complete probation as to the sentences imposed for each conviction. When an accused challenges the length, range or the manner of

7

service of a sentence, this court conducts a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. §40-35-401(d). This presumption is conditioned upon an affirmative showing in the record that the trial judge considered the sentencing principles and all relevant facts and circumstances. State v. Ashby, 823 S.W. 2d 166, 169 (Tenn. 1991). The burden is on the appealing party to show that the sentence is improper. Tenn. Code Ann.§40-35-401(d) Sentencing Commission comments.

A defendant is eligible for probation if the sentence imposed is eight years or less. Tenn. Code Ann. §40-35-303(a). An especially mitigated or standard offender convicted of a Class C, D or E felony is presumed to be a favorable candidate for alternative sentencing in the absence of evidence to the contrary. Tenn. Code Ann. §40-35-102(6). However, the appellant has the burden of establishing suitability for total probation. State v. Boggs, 932 S.W. 2d 467, 477 (Tenn. Crim. App. 1996).

In determining whether to grant or deny probation, the trial court should consider the circumstances of the offense, the appellant's criminal record, social history and present physical and mental condition, the need for deterrence, the accused's potential for rehabilitation, and the best interest of the appellant and the public. State v. Parker, 932 S.W. 2d 945, 959 (Tenn. Crim. App. 1996); State v. Grear, 568 S.W. 2d 285, 286 (Tenn. 1978).

The trial court based its decision to impose incarceration for the offenses upon several factors, including (1) the existence of several enhancement factors, (2) the seriousness of the offense and the necessity to avoid depreciating the seriousness of the injuries inflicted on the victim, (3) the cruelty of the appellant's actions, and (4) his lack of regard for the risk to human life. All of these are valid considerations. Even given these concerns, the court suspended all but ninety days of the sentences.

We give great deference to the trial court who was in a position to judge the appearance and demeanor of the appellant. The action of the trial court was justified. Appellant has not shown he is a favorable candidate for complete probation. His concern about his reaction to incarceration based on his post-traumatic stress disorder apparently has been addressed by the trial court.[1]

For the reasons set forth above, we affirm the judgment of the trial court in all other respects.

_____
CORNELIA A. CLARK
SPECIAL JUDGE


_____
GARY R. WADE
PRESIDING JUDGE


_____
NORMA McGEE OGLE
JUDGE

_____

[1] Under the terms of an "Agreed Order" entered November 12, 1997, the judgment order was amended to reflect that appellant would report to jail in Carter County on January 1, 1998, would stay for 120 days rather than ninety days, would be granted work release, and would be permitted to sleep in the chapel area of the jail rather than "behind actual bars".